1

JEANNE M. CHRISTENSEN
ELIZABETH J. CHEN

2

(To be admitted *pro hac vice*)
**WIGDOR LLP**

3

85 Fifth Avenue, Fifth Floor
New York, NY 10003

4

Tel.: (212) 257-6800
Fax: (212) 257-6845

5

jchristensen@wigdorlaw.com

6

echen@wigdorlaw.com

7

JAMIE C. COUCHE (SBN 252001)

8

**ANDERSON & POOLE, P.C.**
601 California Street, Suite 1300

9

San Francisco, CA 94108
Tel.: (415) 956-6413

10

Fax: (415) 956-6416

11

jcouche@adplaw.com

12

Attorneys for Plaintiffs,
**JANE DOE 1 and JANE DOE 2**

13

14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

16

JANE DOE 1 and JANE DOE 2, *on behalf

17

of themselves individually and on behalf of
a proposed Class of similarly-situated

18

individuals,*

Case No.:

**CLASS ACTION COMPLAINT
SEEKING INJUNCTIVE AND
DECLARATORY RELIEF;
COMPLAINT FOR DAMAGES**

19

Plaintiffs,

**JURY TRIAL DEMANDED**

20

21

vs.

22

UBER TECHNOLOGIES, INC.,

23

Defendant.

24

25

Plaintiffs Jane Doe 1 and Jane Doe 2, individually and on behalf of all others similarly

26

situated individuals ("Plaintiffs"), by and through undersigned counsel Wigdor LLP and

27

28

*Class Action Complaint for Injunctive and
Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.
Case No.:*

Anderson & Poole, P.C., as and for their Class Action Complaint against Defendant Uber Technologies, Inc. ("Uber," the "Company" or "Defendant"), hereby allege as follows:

## I. Uber's Message To Women: Our Profits Over Your Safety

1. Uber will stop at no lengths to make a profit.

2. Since Uber launched in 2010, thousands of female passengers have endured unlawful conduct by their Uber drivers including rape, sexual assault, physical violence and gender-motivated harassment.[1] Recently, the number of reported sexual assaults and rapes of female passengers by male Uber drivers has sky-rocketed.

3. On notice of the magnitude of the number of passengers who have experienced sexual harassment and gender-based violence,[2] Uber should have made drastic changes to the way that it screens and monitors drivers, as well as advancing safety measures on its app and in vehicles, and disclosed the truth to consumers about its insurance coverage during rides.

4. Instead, over the last seven years, Uber has done everything possible to continue using low-cost, woefully inadequate background checks on drivers and has failed to monitor drivers for any violent or inappropriate conduct after they are hired. Nothing meaningful has been done to make rides safer for passengers – especially women.

5. This is no longer an issue of "rogue" drivers who act unlawfully. Uber has created a system for bad actors to gain access to vulnerable victims. Specifically, drivers have

---

[1] Although the Complaint refers to female passengers, inherent in the allegations is the fact that male passengers also have experienced physical, sexual or other gender-motivated harassment at the hands of Uber drivers. Use of the phrases "female passengers" or "female passengers" is inclusive of all passengers that have experienced the type of harm alleged herein.

[2] See Charlie Warzel & Johana Bhuiyan, *Internal Data Offers Glimpse at Uber Sex Assault Complaints*, BUZZFEED, March 6, 2016, *available at* https://www.buzzfeed.com/charliewarzel/internal-data-offers-glimpse-at-uber-sex-assault-complaints.

*Class Action Complaint for Injunctive and*
*Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.*
*Case No.:*

the means and opportunity to veer off route without detection, trap passengers inside their vehicles and commit physical and sexual violence without witnesses.

6.      To skirt state and local regulatory scrutiny, Uber labels itself a "technology platform" company rather than a "transportation" company.  This self-serving guise has added to Uber's ability to avoid spending more money on driver screening both before and after hiring, and to avoid regulatory measures directed at safety during rides.

7.      Because of this lack of regulatory oversight, Uber understands that responsibility for preventing harm against female passengers begins and ends with the Company itself.  Its silent cowardice in the face of such responsibility speaks volumes.

8.      No longer willing to wait for Uber to do something when it is clear that the Company will take no action, Plaintiffs, victims of sexual violence, including rape and sexual assault, at the hands of their Uber drivers bring this action on behalf of all female consumers[3] in the U.S. to force Uber to take immediate and substantive actions to reduce this senseless violence.  Each week, women continue to experience gender-motivated harassment at the hands of the agents that Uber has tasked with the responsibility of transporting passengers safely from one destination to another.

9.      Worse, these women paid money to Uber for what they were told was a "safe ride."

10.     Only through court intervention will Uber cease and desist from making women pay the price for its shameful failure to act.

---

[3]      The terms "passengers" and "consumers" are used interchangeably in the context of this Complaint.

*Class Action Complaint for Injunctive and*
*Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.*
*Case No.:*

## II.    Thousands Of Women At Risk

11.    Because of Uber's failure to prioritize the safety of female passengers, thousands of women are at risk of being trapped in a vehicle and subjected to sexual harm at the hands of an Uber driver who has a duty to ensure their safe transport.

12.    The risk that drivers may subject vulnerable female passengers to sexual, physical or gender-motivated harm is substantial.  There is an inherent risk in getting into a car with a stranger, where a passenger has no idea whether the driver plans to bring her to her destination, if the driver has a gun in the car, or if the driver will make demands beyond those of the agreed upon payment in exchange for "safe" passage.

13.    Uber drivers are free to veer off-route, park in secluded and remote places, lock car doors and engage in heinous violence as described by the Plaintiffs in this action. Alternatively, some Uber drivers have dropped female passengers off, only to follow them into their homes and commit rape and other sexual assaults out of public view.  Since a driver may be technically "off app" in these situations, Uber disclaims all responsibility for a driver's conduct.

14.    It is precisely this risk that forms the basis for laws across the U.S. that require drivers for private transportation carriers to be held to a higher "duty of care."  Taxi drivers and black car drivers are under a <u>non-delegable duty to transport passengers safely during a ride</u>.

15.    In California, for example, common carriers are required to use the highest care and vigilance of a "very cautious person," and do "all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers" when transporting passengers for a fee.  This is why state and local regulations require strict monitoring of criminal backgrounds of drivers working in the taxi and limousine business.  This also is why many cities

*Doe 1, et al. v. Uber Technologies, Inc. Case No.:*

require taxis to be equipped with tracking devices or dash cameras and audio devices to allow the monitoring of rides.

16.     When Uber drivers perform transportation services on the app, they are agents of Uber and perform services that are no different from those performed by taxi drivers or black car drivers.  The law requires that they adhere to a higher standard of care and that they must be carefully scrutinized and monitored before they are tasked with the responsibility of caring for the safety of passengers, especially women.

17.     Despite the exponential increase in reported sexual harassment and assaults to Uber by the women who use its app, nothing has been done to decrease the apparent and known risk of such incidents from taking place.  To the contrary, Uber counts on female consumer usage increasing, and targets marketing ads towards young women travelling alone, knowing that its profits come at the price of these women's vulnerabilities and personal safety.

18.     Uber could take a number of various steps to reduce drastically harm to female passengers.  These safety measures include:

a.      Bar registered sex offenders or individuals with assault or rape convictions (<u>no time limit</u>) from becoming Uber drivers;

b.      Require all Uber drivers nationwide to undergo in-person screening interviews and vehicle examinations;

c.      Install tamper-proof video cameras in all Uber vehicles which immediately set off alarms if they are disabled or malfunction;

d.      Perform national criminal background checks of all drivers every six months;

e.      Voluntarily submit driver information to states that wish to conduct their own screening through state maintained criminal databases, such as in Maryland and Massachusetts;

f.      Require drivers to inform Uber within 24 hours if they have been indicted or charged on any felony involving physical force, violence or weapons, including kidnapping, or misdemeanors involving physical or sexual conduct;

g.      Require drivers to inform Uber within 24 hours of physical restraining orders issued in domestic violence matters;

h.      Utilize Live Scan, a fingerprint-based background check for drivers administered through the Department of Justice and Federal Bureau of Investigation ("FBI") databases for all current and prospective Uber drivers;

i.      Perform thorough character checks on prospective drivers that go beyond mere criminal background checks, such as by interacting with people who may personally know an applicant, in order to learn about the person's reputation and background;

j.      Make high resolution driver photos available for all consumers nationwide to view on their phones to guard against identity fraud;

k.      Disable sharing of driver profiles by associating each profile with a particular phone, facial recognition software "fingerprint" and/or fingerprint, verified at the in-person screening interview;

l.      Engage professional, trained, third-party investigators to perform audits of all current driver employment applications and other required documentation to identify inaccurate, outdated or forged information;

m.      Require all Uber drivers nationwide to install GPS tracking systems in their cars (rather than simply relying on phones and apps, which can be turned on and off), which immediately trigger alarms if they are deactivated or malfunction;

n.      Disable child-lock features on passenger doors of Uber vehicles;

o.      Include in-app panic buttons in the U.S.-based apps that send messages to Uber consumer support, local police, and a designated safety contact to quickly report an escalating

*Class Action Complaint for Injunctive and Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc. Case No.:*

safety situation, such as aggressive driving, a possible abduction, or an assault;

p.   Employ teams of experts dedicated to investigating complaints against Uber drivers of a violent or sexual nature; and

q.   Create a separate online form to report complaints of a violent or sexual nature against Uber drivers.

19.   These proposed safety measures are reasonable and necessary. Although some measures were taken after a prior lawsuit seeking injunctive relief was filed, as detailed herein, Uber needs to address the substantial problems that remain.[4]

20.   Had these measures been in place, thousands of women would have been spared the pain and humiliation that they suffered at the hands of their Uber drivers.

21.   Uber's goal of dominating and controlling the ridehailing market at the expense of consumer safety is a calculated decision made by senior executives that continues through the present.

22.   Court orders are needed to force change that Uber should have taken voluntarily and long before many gender-motivated acts of violence were inflicted on female passengers across the U.S. Each day and week that passes without change is a guarantee by Uber of harm to untold numbers of women who use its app.

## JURISDICTION AND VENUE

23.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed Class has more than 100 members, the Class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

---

[4]   *See* Doe v. Uber Technologies Inc., No. 3:15-cv-424 (SI) (complaint filed N.D. Cal. January 29, 2015).

*Class Action Complaint for Injunctive and Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc. Case No.:*

24.     The Court has personal jurisdiction over Defendant because Defendant is authorized to and conducts substantial business in California, generally, and in this District specifically.  Defendant has its headquarters in this District, and Defendant's policies, practices and protocols relating to the issues in the case were made and acted upon within this District.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this judicial district, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this action occurred in this District as Defendant's policies and practices were made and acted upon within this District.

26.     To the extent there is any contractual or other impediment to pursuit of these claims on a class action basis, Plaintiffs specifically allege, and will prove, if necessary, that any bar to class action proceedings is unconscionable, unfair, against public policy, and unenforceable.

## PARTIES

27.     Jane Doe 1 is an adult woman who is a citizen of and resides in Miami, Florida.

28.     Jane Doe 2 is an adult woman who is a citizen of and resides in Los Angeles, California.

29.     Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business located at 1455 Market Street, San Francisco, California 94103.

30.     Defendant Uber Technologies, Inc. operates in cities throughout the United States.

## BACKGROUND AND FACTUAL ALLEGATIONS

**I.     Uber Technologies, Inc.**

31.     Launched in San Francisco in June 2010, Uber calls itself a "transportation network company."  In the industry called "ridehailing," Uber connects drivers and members of

*Class Action Complaint for Injunctive and*
*Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.*
*Case No.:*

the public through a downloadable smartphone application ("app") called "Uber." Consumers who have downloaded the app use it to make a ride request. They are matched with an Uber driver who picks them up and drives them to a destination. App users must pay for the ride through the app with a credit card. Uber pays the driver a share of the fare collected, and retains the remainder. Uber's sole source of revenue is from charges to passengers for rides taken.

32.    As detailed *infra*, Uber's business model requires an enormous pool of drivers in order to provide rides to consumers quickly and efficiently. To accomplish this, Uber solicits and retains thousands of non-professional drivers.

33.    Uber expanded nationally by entering cities and ignoring long-standing legal and regulatory authority for taxi and limousine services. Such laws exist for many of the safety concerns raised by this lawsuit. By flouting safety regulations, and by hiring non-professional drivers, Uber dominated the vehicle-for-hire market in a fraction of the time it would have taken had it entered the transportation market through traditional methods.

34.    "Profits over safety" quickly became the operating model for Uber's expansion.

### III.    Uber Drivers Are Transportation Agents for Uber

35.    Uber is a common carrier and its drivers are agents that provide a service to Uber.

36.    Uber provides rides to members of the public for a fee. Uber does this as an enterprise engaged in "selling rides" in the same way that a private taxi service sells rides.

37.    When Uber agrees with a passenger via the app to carry out a contract of transportation, drivers are the individuals who pick up the passenger at a certain location and transport the passenger to a certain location. The fact that Uber utilizes software to contract with consumers does not alter the essence of its business enterprise – namely, that of a transportation provider.

38.     When drivers perform the transport, they are the legal "agents" of Uber.  At all times, Uber is the "principal" in the relationship.  Use of an app to organize the ride does nothing to alter the agent/principal relationship.  In fact, the app is simply a modern version of the traditional method where consumers had to telephone a taxi company in order to arrange for their ride.

39.     Similarly, consumers can, and often do in large cities, use the app to order an Uber when they are on the street.  Using the app eliminates a person from raising their arm in a traditional street "hail" but, effectively, the Uber app is no different from hailing a taxi, but for the fact that the passenger has a credit card account on file with Uber and the monetary transaction takes place via the app.

40.     In sum, Uber's self-serving claim that it operates as a "technology" company and not as a traditional taxi service, does nothing to disassociate the essence of its business services as anything outside of a taxi service.

41.     When drivers perform the transportation, they are acting at all times pursuant to Uber's control and serve to carry out the performance on behalf of Uber.  In connection with this, all money is exchanged between passengers and Uber, and all agreements about the transportation service flow between passengers and Uber.

42.     At no time do passengers personally contract with drivers for transport in exchange for a fee.  Uber, not its drivers, is the sole decision-maker when it comes to pricing, rates, fares, or payments provided.

43.     Passengers pay Uber; Uber pays drivers.

44.     Because Uber is a transportation company that provides rides to the general public for a fee, it is subject to the laws governing common carriers.

45.     When drivers carry out a contract of transportation for Uber, Uber is under a non-delegable duty to transport passengers safely.

46.     At all times, drivers, whether labeled "agents" or "employees" of Uber, also are held to transport passengers according to a higher standard of care.

47.     Uber, as a common carrier in California, is required to use the highest care and the vigilance of a very cautious person.

48.     Furthermore, it must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers.

49.     In connection with this duty of care, Uber is required to, but does not, make policy decisions at all levels of Uber's management to ensure that the highest care is exercised with respect to Uber's transportation of consumers.

## IV.    Jane Doe 1

50.     Jane Doe 1 is an adult woman who resides in Florida.

51.     On the evening of October 14, 2016, Ms. Doe 1 and a female friend ordered an Uber to travel from Ms. Doe 1's home in South Miami to nearby Coral Gables, Florida.

52.     Ms. Doe 1 had just recently downloaded the Uber app, and this was her first ride using Uber.

53.     Ms. Doe 1 and her friend took an Uber ride to a restaurant in Coral Gables. During the evening, Ms. Doe 1 had two drinks.  Despite having consumed only two drinks, at some point, she began to feel sick and light-headed.  Ms. Doe 1's friend consumed alcoholic drinks during the evening.

54. In the early hours of October 15, 2016, Ms. Doe 1 and her friend were picked up by Uber driver Nimer Abdallah ("Abdallah") to transport them from Coral Gables back to Ms. Doe 1's home in South Miami.

55. This ride was ordered using the Uber app installed on Ms. Doe 1's iPhone, which had the "Touch ID" unlock function enabled.

56. Unbeknownst to Ms. Doe 1 when she got into the car, Abdallah had previously been charged with a felony in Miami, Florida.

57. Ms. Doe 1 has limited recollection, if any, of the 20-minute ride. When Abdallah arrived at their destination, Ms. Doe 1 was barely conscious. Although Ms. Doe 1's friend did not ask for help, Abdallah threw Ms. Doe 1 over his shoulder and carried her upstairs to her sixth floor apartment. Abdallah proceeded to enter the apartment and carried Ms. Doe 1 into her bedroom.

58. Ms. Doe 1's friend saw Abdallah sprawled on top of Ms. Doe 1 on her bed, kissing her. When the friend demanded that Abdallah leave the apartment, his only response was to invite her to join them on Ms. Doe 1's bed. Her friend became so frightened that she locked herself in the bathroom of the apartment, terrified. She passed out in the bathroom for the rest of the night.

59. When Ms. Doe 1 woke the next morning, she was alarmed to discover that she was not wearing pants or underwear, and was lying in a horizontal position across the foot of her bed.

60. Ms. Doe 1 was further distressed to find discharge from her vaginal area and what appeared to be semen stains on her comforter, close to where she had been lying.

61.    Upon learning from her friend that Abdallah had entered the apartment and carried her into the bedroom, Ms. Doe 1 became concerned that she had been sexually assaulted.

62.    She searched, unsuccessfully, for any trace of a used condom.

63.    Ms. Doe 1 reported the incident to the police, who took her statement, a copy of her Uber receipt, clothing and the bedding with suspicious staining, as well as surveillance footage from her apartment complex showing Abdallah dragging Ms. Doe 1 from his car and carrying her into the apartment building.

64.    On or about October 17, 2016, as part of an official police photo line-up, Ms. Doe 1's friend successfully identified Abdallah as their Uber driver.

65.    That same day, Ms. Doe 1 was treated at a rape treatment center at a local hospital, where a rape kit and examination was performed, and samples were collected for STD and toxicology tests.

66.    On or about October 18, 2016, Abdallah was arrested and charged with two counts of Sexual Battery.

67.    During police questioning, Abdallah admitted to removing Ms. Doe 1's pants and underwear, kissing her breasts, digitally penetrating her vagina, and inserting his penis into her vagina.

68.    Abdallah furthermore confessed to the police that "he was wrong for what he did," and according to the police report admitted that he was aware that the victim had been drinking before he assaulted her.

69.    The case is pending in the Circuit Court of Miami-Dade County, Florida.

70.    Abdallah subsequently posted bond and has been released.

71.     Ms. Doe 1 contacted Uber regarding the incident, and she was informed that Uber would be "taking the appropriate action here."

72.     To this day, Uber has not confirmed that Abdallah has been deactivated from driving for Uber.

73.     Uber did, however, offer to refund Ms. Doe 1 $9.51 for her ride with Abdallah.

## V.     **Jane Doe 2**

74.     Jane Doe 2 is an adult woman who resides in Los Angeles, California.

75.     On the evening of January 18, 2017, Ms. Doe 2 was with friends at a restaurant in Silver Lake, California.

76.     Although she only had a few alcoholic beverages, she became intoxicated very quickly.

77.     The group returned to one person's home.

78.     Later, Ms. Doe 2 requested an Uber from the app on her phone to take her approximately two miles to her residence.

79.     She was picked up by an Uber driver, Miguel Last Name Unknown ("Miguel LNU").

80.     Ms. Doe 2 sat in the backseat and proceeded to fall asleep.

81.     When she awakened, to her horror, Ms. Doe 2 saw that Miguel LNU was in the backseat and his mouth was on her vulva.

82.     Ms. Doe 2 was able to see that the car was parked in a park and that it was raining heavily.  The driver then proceeded to Ms. Doe 2's residence, and followed her into her home.

83.     Although she was in and out of consciousness, Miguel LNU forced her to engage in intercourse against her will and then left.  Ms. Doe 2 passed out.

*Class Action Complaint for Injunctive and
Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.
Case No.:*

84.     A few hours later, Miguel LNU began texting and calling Ms. Doe from various phone numbers, leaving messages that he wanted to see her.

85.     Ms. Doe 2 does not know how Miguel LNU obtained her phone number, as Uber purportedly uses a cell phone number masking system for drivers and passengers to contact each other.

86.     The following morning Ms. Doe 2 woke up disoriented and confused.

87.     Ms. Doe 2 found a used condom in her toilet and as a result, went to a medical clinic for STD testing.

88.     What happened to Ms. Does 1 and 2 is happening to women across the U.S. Shockingly, it is happening with greater frequency.   Upon information and belief, more than 1000 passengers have experienced rapes, sexual assaults and gender-motivated harassment by their Uber drivers.

89.     Hundreds of incidents of such violence have been reported in the last several years such that it is impossible to set forth each reported attack by an Uber driver against a female passenger in this Complaint.[5]

## VI.     #MeToo Campaign

90.     Several weeks ago, in response to well-publicized charges by women against Harvey Weinstein and his film company, The Weinstein Company, a campaign on Twitter using the hashtag "#MeToo" began circulating.   The movement was intended as a means for individuals to share stories about sexual harassment and its prevalence for women in all walks of life, in a multitude of contexts.

---

[5]     *See* http://www.whosdrivingyou.org/rideshare-incidents#sexualassaults.   This frequently updated site provides a list of sexual assaults and harassment by drivers for Uber and Lyft.  As of November 13, 2017, more than 330 incidents are set forth on the site specific to sexual assaults and harassment.  During an approximate 12-week period in 2017, the site reported that 92 individual incidents of sexual assaults were reported in the media.

*Class Action Complaint for Injunctive and*
*Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.*
*Case No.:*

91.    The #MeToo campaign has resulted in thousands of individuals sharing stories about sexual assault, including rape, and other gender-motivated harassment.  In weeks, as a direct result of shared information on #MeToo, a number of influential and powerful men have been outed for claims of sexual misconduct.

92.    Hundreds, if not thousands, of #MeToo tweets report sexual assaults, including rapes, and other gender-motivated harassment, experienced by female passengers at the hands of their Uber drivers, detailing incidents from several years ago through the present.

93.    Indeed, the sheer volume of reports makes it impossible to list each tweet herein. By way of example only, all of the following tweets were posted in October 2017:

- "I was tired & snoozed off in an @Uber. I woke up in fear. The car was parked in an alley. The driver was in the backseat next to me. #MeToo."

- "Hey @Uber think your driver could take the title of dirty video he was watching before he picked me up off his screen during a ride? #MeToo." (the screen shot showed a video about "big titties." On the Uber driver's dash).

- "A few years ago, I was in an Uber arriving at my apartment when the driver made inappropriate comments and grabbed at my crotch. #MeToo."

- "This @Uber driver today pulled out his Man part (one eyed snake) and thought I didn't see him so upset here's the video #MeToo." (Las Vegas).

- "Client sexually assaulted, harassed and threatened by Chicago Uber driver."

- "When a 50-year-old male Uber driver rubbed my leg and tell me its 'sexy' when I was in a black dress on the way to my hostess job."

- "One of my more recent #MeToo stories was when my @Uber driver started calling and texting me after my ride. I blocked him. Horrified."

94.     New reports by female passengers about Uber passengers emerge daily. Importantly, these women are located in cities across the U.S.

**VII.     <u>Terrorist Attack in Manhattan on October 31, 2017</u>**

95.     On the afternoon of October 31, 2017, in lower Manhattan, a 29-year-old man driving a rental truck intentionally drove into a crowded pedestrian and cyclist path, killing eight people, and seriously injuring more than eleven others.

96.     That day, the New York Police Department apprehended the person believed to have committed the heinous killings, and identified the arrested driver as Sayfullo Saipov.

97.     Shortly after Mr. Saipov's arrest, Uber released a public statement disclosing that Mr. Saipov was a driver for Uber on October 31, 2017.  According to Uber, Mr. Saipov passed Uber's background check to become an Uber driver and had been actively driving on the Uber app for more than six months.  Upon information and belief, Mr. Saipov drove for Uber in at least two states: Florida and New Jersey.

98.     On October 31, 2017, Uber said that it had banned Mr. Saipov from the app.

99.     Uber claimed that it was assisting law enforcement and said it was "horrified by this senseless act of violence."

100.     Incredulously, for the last six years, Uber has issued the same public statement each time a report of violence surfaces in the media, including after a driver in Kalamazoo, Michigan went on a shooting spree while on the Uber app and shot at and murdered individuals in the process of picking up passengers.

101.     Despite Uber's purported "horror," it has failed to change.

*Doe 1, et al. v. Uber Technologies, Inc.*
                    *Case No.:*

VIII.   **Inadequate and Careless Background Checking Process: Wilful Blindness in Hiring and Supervising Drivers**

102.   Uber, from the highest executive levels, including directors, officers, and managing agents, makes an intentional decision to look the other way when hiring and supervising drivers. As a calculated cost-cutting device, Uber uses a procedure to review a potential driver's background that is inherently flawed. Specifically, the background checking methods used by Uber cannot assure passengers that the driver behind the wheel does not have a history of violence or other background information that would cause a reasonable company to make further inquiries into a potential driver's history.

103.   To become a driver for Uber, individuals apply through Uber's website. The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance. Drivers need not show that they own the vehicle that will be used to transport rides.

104.   At no point does Uber verify that the person applying to be the driver is uploading his or her own personal documents, including his or her own profile photo which can be used to verify the accountholder. As a result, numerous drivers have registered to drive on the Uber app by using falsified identities, false social security numbers, false driver's licenses and false photos.

105.   In September 2016, Uber announced the introduction of "Real-Time ID Check" a new security feature where drivers are periodically prompted to take a photo of themselves using their app (a "selfie") as a condition of accepting and continuing ride requests.

106.   Facial recognition technology is used to analyze the selfie and verify that the driver using the app at that time is the same person whose photo is registered on file.

107.     Uber states that if the facial recognition technology does not match the selfie to the profile picture on the driver's Uber account, the account will be suspended pending investigation.

108.     However, the Real-Time ID Check feature does not prevent a driver from setting up an account using someone else's identity, but uploading their own photo, which would then bypass the sporadic selfie check.

109.     In addition, it has been reported that hackers have been able to bypass facial recognition software by using composites of images from sources with resolutions as low as those available on Facebook or other social media websites.

110.     Until as recently as 2015, Uber used Accurate Background, Inc. ("Accurate"), formerly known as Hirease, LLC ("Hirease"), a private background check company.

111.     Accurate does not perform stringent background checks.   Drivers were not required to submit fingerprints for comparison against Department of Justice and FBI databases. Rather, Accurate simply ran potential drivers' social security numbers through records databases similar to those held by credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions.

112.     As such, if a potential driver was convicted of a violent crime ten years prior to applying to become an Uber driver, the Company would have no way of knowing such a fact.

113.     Uber simply looks the other way when it comes to any acts that may have occurred beyond the arbitrary seven-year cut-off.

114.     Moreover, through these procedures, Uber fails to conduct a seven-year review of any information for drivers who have resided in the U.S. for less than that time.   Uber simply ignores any period beyond what records it can obtain in the U.S. By way of example only, if an

*Doe 1, et al. v. Uber Technologies, Inc.
Case No.:*

Uber driver moves to a city in the U.S. from another country, such as Canada, the United Kingdom or France, and has resided here for only a few years, the only records reviewed by Uber pertain to records available in the U.S. No steps are taken to inquire about the potential driver's history from his or her former country.

115.    Indeed, if a potential driver knows that he will be unable to pass even the lenient existing background checks, that potential driver could simply ask a friend to share their information and thus gain access to driving on the platform.

116.    Shockingly, Uber fails to implement stricter background checks for its potential drivers to whom Uber passengers will later entrust their lives and well-being, despite knowing that job applicants frequently submit false information to their employers, especially online. In fact, on its website at the time, Hirease acknowledged that many job applicants lie about information they submit to an employer, and that "40% of resumes contain material lies or omissions about education, past employment or qualifications."

117.    Hirease also has recognized the importance of background checks to weed out applicants with criminal backgrounds. As Hirease stated, "10% of job applicants have a criminal record." Nonetheless, Uber does not require fingerprint background checks for its applicants, which would turn up a person's criminal history beyond the seven-year period.

118.    Moreover, if a driver commits a crime and is convicted of it after Accurate ran its initial background check, Uber will not be notified.

119.    Upon information and belief, beginning in 2015, Uber has started using Checkr, Inc. ("Checkr") to conduct background checks. Unfortunately, Checkr operates in substantially the same manner as Hirease and Accurate.

IX. **Uber's Deficient Background Checks Exposed by Massachusetts and Maryland Regulators**

120.    The faulty and defective quality of Uber's screening of drivers' histories was recently exposed by the state of Massachusetts and Maryland.

A.    **Massachusetts Exposes More Than 8000 Drivers with Criminal Histories**

121.    In January 2017, pursuant to an agreement between Uber, Lyft (a ridehailing app similar to Uber) and the State of Massachusetts, Uber and Lyft drivers were subjected to state-run background checks.  Notably, this additional screening was intended for drivers that had passed Uber's background test already.

122.    According to media reports, approximately 70,789 Uber and Lyft drivers applied to the newly formed Transportation Network Division for a Massachusetts state license and thus had background checks run on them.

123.    In April 2017, the Massachusetts Department of Public Utilities announced that more than 8,000 Uber and Lyft drivers failed the state screening even though these drivers already had passed background checks at Uber and Lyft.

124.    Alarmingly, the state rejected 8,206 of the drivers.  Among those rejected, it was reported that **1,599 drivers were found to have a history of violent crime**, and incredibly, Uber and Lyft background checks had **failed to identify 51 registered sex offenders**.

B.    **Maryland Exposes Uber's Deficient Background Screening**

125.    In December 2016, the Maryland Public Service Commission ("Maryland PSC") approved alternative background checks for Uber and Lyft drivers after both companies claimed that their background screening processes were more comprehensive than fingerprint-based checks.

126.    Maryland PSC's more stringent requirements included an annual background check for each driver; a requirement that a Transportation Network Company (any company that provides a ridehailing service similar to Uber and Lyft) must provide written confirmation that they have verified the identity of the driver; and extending the background check to the applicant's entire adult life, <u>going beyond the seven years that Uber's commercial background checks currently review</u>.

127.    Figures released by Maryland PSC in April 2017 show that since implementing the state's expanded background checks of 70,991 Uber applicants, **4,310 applications were rejected**, for reasons that include criminal convictions.   Upon information and belief, these criminal convictions were not caught by Uber's "more comprehensive" background checks.

128.    Shockingly, in October 2017, Maryland PSC reported that in <u>the last six months</u>, nearly 15% of new ridehailing drivers in Maryland were cast out and banned from driving in Maryland as a result of the state's own screening of drivers, even though these drivers had passed the background checks of Uber and Lyft.   Importantly, Maryland PSC reported that in 95% of the cases where drivers were rejected, the individuals were drivers for Uber.   Maryland PSC stated that at least 460 drivers were banned because of "disqualifying criminal histories."

**X.    "We do the right thing. Period."**

129.    As part of recent leadership changes, Uber's new Chief Executive Officer introduced changes to the Company's defined cultural values.   One of the new goals is "We do the right thing. Period."

130.    Because Uber knowingly has worked to silence passenger complaints about driver conduct and done everything possible to contain negative information, drastic changes are

needed before Uber can assert that it is doing "the right thing." To begin, Uber must engage in transparency and release such basic information as the following:

- In the last year, how many reports from passengers does Uber receive about alleged rapes, sexual assaults and gender-motivated harassment inflicted by Uber drivers?

- What does Uber do with these reports and what protocols exist for accurately and quickly assessing the veracity of the complaints?

- How many internal investigations were conducted in the last six to twelve months about alleged rapes, sexual assaults, and gender-motivated harassment as a result of passenger complaints?

- In the last year, for example, what changes, if any, has Uber implemented as a direct result of internal investigations?

- What systemic protocols are currently under evaluation in order to increase passenger safety?

- Why does Uber represent to consumers that individuals can assess the risks associated with taking rides with drivers who are not professionally licensed, when Uber fails to disclose the data necessary for consumers to make such determinations?

131. As part of its business model, Uber has opted to protect the brand at the expense of passengers' safety. For any meaningful change to occur, Uber must be transparent about data regarding reported violence by drivers.

132. Uber's history of silence about such information has not gone unnoticed. Recently, a San Francisco judge sanctioned Uber for the Company's failure to comply with a search warrant for records on a driver suspected of sexually battering a female passenger. The judge stated:

> "The reputation of Uber for cooperating with law enforcement is horrific. The fact that Uber resists search warrants gives me grave concern that there is an ulterior motive here and not any desire to cooperate."

133.     The case involved charges against a 42-year-old Uber driver, Leonid Beker ("Beker"), for an attack on a female passenger in May 2017.  According to the charges, Beker stopped the car, got in the back seat and restrained and attacked his female victim.  The attack went on for more than ten minutes before Beker stopped.  Uber argued that it should not have to turn over even 90 days of Beker's driving records because while it was "very committed to safety," providing Beker's driving records might cause law enforcement to "call passengers and ask if they'd had a bad experience with an Uber driver."  Senselessly, Uber said it should not have to turn over records for rides with two to five stars because it was "unlikely a sexual assault victim would give a good review."  Without any rational basis, Uber said that records for rides involving male passengers were not relevant.

134.     If Uber was sincere about doing "the right thing," it would not be resisting court orders for the production of information on file about drivers charged with rape, sexual assault or gender-motivated harassment.

## XI.     Material Misrepresentations to Passengers that Uber Provides the "Safest Rides on the Road"

135.     The application process to become an Uber driver is simple, fast and designed to allow the Company to hire as many drivers as possible while incurring minimal associated costs.  Such cost saving, however, is at the expense of passengers, especially female passengers.

136.     Indeed, in a complaint filed by the District Attorney of San Francisco and the District Attorney of Los Angeles, *The People of the State of California v. Uber Technologies, Inc.*, Case No. 14-cv-543120-CGC (Superior Court of the State of California, filed August 18,

2015), it was alleged that Uber's security screening is so deficient that, upon information and belief, individuals *passed* Uber's screening process and were found driving for Uber with the following felony convictions: (1) second degree murder; (2) lewd and lascivious acts against a child under the age of 14; (3) sexual exploitation of children; (4) kidnapping for ransom with a firearm; (5) assault with a firearm; (6) grand theft; (7) robbery; (8) identity theft; (9) burglary; and (10) taking a vehicle without consent.   In addition, a number of Uber drivers, upon information and belief, have previously been convicted of driving under the influence and driving with a suspended license and yet still passed Uber's purportedly strict background checks.

137.    Rather than notify passengers of these failures, Uber fills its website with pictures of smiling young women entering and exiting vehicles, which are meant to appear "safe."



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







*Class Action Complaint for Injunctive and*
*Declaratory Relief; Complaint for Damages*

*Doe 1, et al. v. Uber Technologies, Inc.*
*Case No.:*





138.    In fact, Uber has misrepresented to consumers, on a global scale, on its website, the following:

> **Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road.**   That means setting the strictest safety standards possible, and then working hard to improve them every day.  The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – **what we are doing in the US is an example of our standards around the world.**

(emphasis added).

139.   Today, Uber continues to declare that it is "dedicated to keeping people safe on the road. Our technology enables us to focus on rider safety before, during, and after every trip."

140.   Until October 2014, Uber represented on its site that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards.  This includes a three step criminal background screening for the U.S. – **with county, federal and multi-state checks that go back as far as the law allows** – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

141.   However, because Uber disclaims day-to-day supervision of its drivers, it cannot be aware of how often drivers pick up passengers while the drivers *themselves* are intoxicated or under the influence of other drugs.  This is problematic for many obvious reasons, not least because Uber drivers can convey a passenger to a destination, stop for a few drinks and/or some illicit substances, and then turn the app back on and continue driving, putting the passenger in unnecessary danger.

142.   In fact, upon information and belief, nothing stands in the way of an Uber driver, looking to earn as much as possible, from keeping his app signed in and accepting rides for a 24-hour shift, which would also be incredibly dangerous to passengers.

143.   Although Uber attempts to distance itself from situations in which it would potentially incur liability, a consumer would need to sift through pages of text and click through multiple links in order to even find the following section in which Uber unbelievably tries to disclaim responsibility for negligent and harmful conduct by its own drivers:

> You understand, therefore, that by using the application and the service, **you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or otherwise objectionable**, and that you use the application and the service at your own risk.

Page **28** of **58**

(emphasis added).

144.    Ms. Doe 1 and Ms. Doe 2 were victims of "unsafe," "dangerous" and "offensive" conduct by their Uber drivers.

**XII.    The Number of Reported Incidents of Sexual and Other Assaults by Uber Drivers, Largely Against Female Passengers, Indicates Systemic Deficiencies Regarding Uber's Safety Measures Concerning Drivers**

145.    Sadly, the details about what happened to Ms. Doe 1 and Ms. Doe 2 are not anomalies. Rather, a litany of incidents regarding sexual assaults, and physical assaults, by Uber drivers on passengers, shows a pattern of similarly heinous, but avoidable attacks.

146.    Upon information and belief, hundreds of sexual assaults by Uber drivers against Uber passengers, almost all women, have been reported in the media. By way of example only, and to provide an overview, a few examples are set forth below:

147.    On or around September 4, 2017, Ismael D. Moussaoui, a Seattle-based Uber driver, was charged with second-degree rape for allegedly attacking a 23-year-old woman. In court documents, prosecutors alleged that "The defendant used his position as a car service driver to prey on the victim…[he] sexually assaulted the victim in the backseat of his car. The victim was able to fight him off and was left on the side of a road screaming and partially clothed."

148.    In August 2017, a Massachusetts Uber driver admitted to exposing himself to multiple young girls and was sentenced to two and a half years in jail. The driver, Paul Griffin ("Griffin"), aged 29, was charged with six counts of open and gross lewdness, six counts of accosting and annoying a person of the opposite sex, operating a motor vehicle to endanger, failure to stop for police and resisting arrest. In addition to jail, the court ordered that Griffin was barred from employment with any ridehailing or taxi company.

149. An Orange County, California Uber driver was charged with raping a female passenger in his vehicle in March 2017 while driving the woman home from a company gathering in Newport Beach.

150. Unsurprisingly, Uber offered its scripted but hollow public statement, "**Nobody should have to go through what this woman reported to police**." Incredulously, Uber has issued this same statement countless times over the last seven years, yet reports of violence against female passengers are increasing at a shocking pace.

151. In the summer of 2016, a Drexel University student reported publicly that she was sexually assaulted by an Uber driver. The young woman stated she and a friend were out at the Philadelphia Museum of Art and called an Uber Pool to head home. A young man was sharing their ride and was sitting in the back seat. Her friend was dropped off first and, although her apartment was just four blocks away, the Uber driver claimed that he "took a wrong turn" and dropped off the male passenger first. Thereafter, the Uber driver started touching her. The woman said she was "pressed up against the corner of the car" and saying "please stop, please stop." When the car stopped at a light, she luckily was able to maneuver the locks and escape into the street where she called for help.

152. On or around August 22, 2015, Efren Madrigal ("Madrigal"), a newly minted Uber driver who had been on the road for only three days, was accused of raping a passenger in New Jersey. The female passenger and a friend had initially invited Madrigal in to play cards and chat after he picked them up through Uber and dropped them off at the victim's home. The friendly encounter rapidly became dangerous, however, as Madrigal allegedly then proceeded to assault the woman who had ridden with him. Uber stated that the incident was "deplorable" and that Madrigal was blocked "as soon as [Uber was] made aware of the allegations."

153.    In August 2015, a female Uber passenger in Dallas alleged that her driver had raped her.  It was discovered that her Uber driver had been convicted of a number of felonies but was approved to drive for Uber.  The driver allegedly followed her into her apartment and raped her there.  Uber later issued details regarding the investigation it undertook of the driver and admitted to improperly permitting him to drive.

154.    On April 30, 2015, a female Uber passenger in New York City alleged that she was sexually assaulted and groped by her Uber driver.  After falling asleep during the ride, she claims that she awoke to her driver caressing her face, after which he grabbed her face and leaned in for a kiss.  Fortunately, she was able to escape, but stated that "If I hadn't pushed him away, then I'm pretty certain he would have done more."

155.    In late April 2015, a University of Southern California ("USC") student accused an Uber driver of raping her while she was unconscious, unaware, and unable to consent to any sexual acts.  Ironically, in March 2015, USC had issued a crime alert about an alleged sexual assault and recommended that students use Uber to stay safe.  That language was excluded from the campus alert sent out after the April 2015 incident.

156.    Also in late April 2015, two women were allegedly assaulted in Madison, Wisconsin by their Uber driver(s).

157.    On February 6, 2015, in Philadelphia, Pennsylvania, a female passenger alleges that she was raped and kidnapped by her Uber driver.  According to a police report, the Uber driver held her down, ripped her pants, raped her, and then held her captive, continuing to drive her around for nearly two hours, refusing to let her out of the car.  Uber claims that it was unaware of any such incident until forty days after the victim first reported the alleged sexual

*Class Action Complaint for Injunctive and Declaratory Relief; Complaint for Damages*                    *Doe 1, et al. v. Uber Technologies, Inc. Case No.:*

assault.  Indeed, the Uber driver remained on the road, continuing to drive for Uber, for the duration of that time.

158.    In December 2014, an Uber driver in Los Angeles allegedly attempted to grab and kiss a female passenger, who happened to be South African singer/songwriter Nikki Williams, on her driveway.  Ms. Williams was able to fight him off and run inside her house.

159.    Furthermore, on August 14, 2014, an Uber driver in Washington, D.C. was accused of sexually assaulting a passenger in the back of his Uber car.  The passenger accused the driver of touching her while she was asleep in the car.

160.    Likewise, in September 2014, an Uber driver in Orlando, Florida was arrested after a female passenger accused him of grabbing her breast and fondling it in an aggressive manner.  The driver was accused of repeatedly commenting on her appearance before stopping the car and shoving his hand in her tank top to fondle her breast.

161.    Moreover, on December 6, 2014 in Boston, Massachusetts, Uber driver Alejandro Done ("Done") allegedly pulled up to a residence and picked up a young woman waiting for the pre-arranged driver.  The woman had been out with friends and decided to use a car service to get home.  Done picked up the woman and allegedly drove to a location that she was not familiar with, pulled over to a secluded area and jumped in the backseat, struck her with his hands, strangled her, locked the car doors so that she could not escape, and sexually assaulted the woman.  In October 2015, Done pleaded guilty to aggravated rape, kidnapping and assault and battery of his female Uber passenger.  He was sentenced to serve 10 to 12 years.

162.    In Washington D.C., in December 2012, an Uber driver allegedly grabbed a 20-year-old female passenger from behind as she exited the car, knocked her to the ground causing her head to hit the concrete, and then raped her.

163.    The above examples are just a sampling of the number of accusations of violent and aggressive behavior made against Uber drivers by unsuspecting female passengers.

164.    Such tragic incidents, while avoidable, are no surprise given Uber's hollow commitment to consumer safety.

## XIII.    Uber Targets Intoxicated Passengers

165.    Uber's advertising campaigns make the assertion that it provides the best option for a safe ride home after a night of drinking.  Indeed, the Company commissioned a report with Mothers Against Drunk Driving ("MADD") where it declared: "When empowered with more transportation options like Uber, **people are making better choices that save lives**" (emphasis added).

166.    Uber further claimed that "Uber and MADD are working toward a world where a safe ride is always within reach and where drunk-driving is a thing of the past."

167.    The report and others have been widely publicized by Uber and its press team, correlating the existence of Uber drivers and vehicles in a city with diminished drunk driving rates.

168.    Uber's marketing campaign has expanded to include discounts for Uber users to purchase the "Breathometer," a smartphone breathalyzer, and the companies have partnered to provide rewards in exchange for continued use.

169.    What Uber has not shared with passengers is that making the choice to hail a ride after drinking also puts those same passengers in peril from the Uber drivers themselves.  By marketing heavily toward young women who have been drinking while claiming that passenger safety is its #1 priority, Uber is instead putting these women at risk.

170.    Although Uber advertises that it is committed to providing consumers with the "safest ride on the road," the reality is that at the hands of an Uber driver, Plaintiffs and the Class were subjected to traumatic and harrowing sexual violence that no person should be forced to endure.

## XIV.  **Uber Misleads Consumers About Insurance Coverage For Rides**

171.    Uber knowingly has and continues to mislead consumers, including Plaintiffs and Class members, about insurance coverage relating to rides facilitated through the app.

172.    The consequence is significant.  Because Uber refuses to commercially insure drivers, and Uber's drivers are not commercially licensed nor insured, a substantial deficit of appropriate coverage exists.  In contrast, regulated taxi and limousine companies are forced to comply with commercial insurance minimums imposed by local and state legislation that exists to protect individual consumers.

173.    Uber's refusal to insure drivers is a cost-saving measure, but it is also a reflection of the Company's intentional decision to distance itself from potential liability, given its intimate knowledge of the risks and potential dangers associated with allowing non-professional drivers access to transport individual consumers without any oversight.

174.    Based on the allegations herein and the known risks and harm to female passengers at the hands of their Uber drivers, the Company's failure to provide adequate insurance coverage is abhorrent.

175.    Uber deceives consumers by failing to disclose its policies regarding insurance coverage of its drivers.  As a result, consumers are misled into believing that the types of insurance policies that underwrite most for-hire transportation providers, including taxis and black car companies, also protect them when they use the Uber app.

176.    Consumers are deceived by Uber about coverage for the different stages of a ride, specifically, before, during and after the ride, as well as whether coverage exists by way of the driver's own personal, non-commercial insurance policy, or supplemental excess coverage offered by Uber only for certain stages of a ride.

177.    For example, over the last several years, as part of the "Safety" page, Uber has posted different messages to consumers about insurance coverage, primarily drawing attention to the fact that during a ride on the app, Uber provides drivers a "one million dollar liability policy."

178.    This claim is misleading and false in a number of ways, however, based on Uber's classification of drivers as independent contractors, Uber's classification of periods before, during and after a "ride," and how Uber's insurance coverage interacts with a driver's insurance.

179.    In the Uber ridehailing context, there are three distinct periods for purposes of insurance coverage.

- *Period 1* covers the time when an Uber driver is on the app and waiting for a ride request. During Period 1, Uber does not provide any collision coverage and drastically lowers the liability coverage -- creating a "gap" in coverage.

- In *Period 2*, the point in time when a driver accepts a ride request on the app and is en route to the passenger, Uber provides additional insurance coverage.

- *Period 3* is identified as beginning when the passenger gets into the Uber driver's vehicle. Uber provides coverage at this time. However, from the moment a driver turns off the app, regardless if he is still in transport or the consumer is in the vehicle, Uber's insurance policies may no longer provide coverage. Unquestionably, there is a multitude of scenarios during which liability could arise yet no coverage is available, through Uber or the driver's own policy.

180.    Indeed, many Uber drivers were surprised to learn that their personal insurers disclaimed coverage once the insurer found out that the driver was providing transportation for Uber.

181.    It is an industry standard for most personal insurance policies to disclaim coverage when a driver is "working."  If an Uber driver disclosed to his insurer that he was driving for Uber as a means of earning income, almost all insurers would require that driver to purchase commercial coverage – regardless of the driver's status as a non-commercially licensed driver.

182.    Recently, some insurance companies have responded to the ridehailing industry and have started to offer a hybrid insurance policy to cover Period 1 and other gaps in coverage.

183.    For instance, Erie Insurance allegedly offers policies that cover driving for personal or business use, and during every part of a ridehailing trip, specifically, before, during and after the ride.

184.    Upon information and belief, this insurance is available to Uber drivers in Pennsylvania only.

185.    Other insurers offer policies specifically intended to cover the gap in coverage during Period 1, and other policies are designed to provide primary coverage whether or not a driver has a passenger in the vehicle.

186.    But, for drivers who transport passengers in states that do not offer these new hybrid policies, their only option to protect themselves is to purchase a commercial policy that can cost as much as ten times the cost of personal insurance.

187.    Importantly, Uber does not require drivers to cover insurance gap periods, including Period 1 or events immediately after a ride is over but relating to the consumer's ride, referred to as the "time after drop off."

188.    For rapes, sexual assaults or other gender-motivated violence that takes place when the driver turns off his app or exits the vehicle and commits the violence outside the vehicle, on the street or even several hundred feet from the vehicle, Uber's policies state that the Company is not responsible for harm during this "gap."

189.    As such, passengers blindly request transportation using the app without knowing whether their driver is adequately insured.

190.    Moreover, when a driver accepts a passenger via a "street hail," specifically, when an individual is picked up on the street without using the app, despite the Uber sign in the vehicle and other indicators that the driver works for Uber, there is no insurance coverage offered by Uber at any moment during Periods 1-3.

191.    Many regulated taxi companies in cities throughout the country must purchase specific insurance to cover street hails based on the realistic expectation that drivers will be induced to pick up passengers off the street for cash.  Similarly, taxi and private for-hire car companies are required under state and local laws to employ only commercially licensed drivers, and by definition, these employers are required to provide insurance coverage for any period during the transport of a passenger.

192.    Due to this systemic and serious problem that Uber knowingly fails to correct, more than thirty states have issued public consumer warnings about the lack of insurance coverage involved with rides on the Uber app.

193.    By way of example only, such states include Kentucky, "What You Need to Know About Ridesharing Programs;"[6] and Connecticut ("Consumer Alert: Drivers who work for transportation network companies (TNC) may not be covered by their personal automobile insurance policies while driving for hire. This is due to a common exclusion in most personal auto policies for claims arising while driving for hire, a practice sometimes referred to as livery service…. while every personal automobile insurance policy differs, nearly all contain exclusions for livery. If a policy contains a livery exclusion, this means that the policy generally will not provide coverage for liability incurred while driving passengers in exchange for remuneration, other than an expense-sharing arrangement, such as a carpool."), as well as Maine, New Hampshire, New Jersey, Rhode Island, Washington and the District of Columbia.

## XV.    Drivers Are Employees

194.    Uber employs its drivers in traditional at-will relationships, in which the Company has the discretion to fire its drivers for any reason and at any time.

195.    Drivers are not charged a fee by Uber to apply to become employees.

196.    Drivers are not charged a fee to download the app to receive notifications of rides mediated by Uber.

197.    Furthermore, fare prices for rides are set exclusively by Uber executives. Drivers have no input on fares charged to consumers. Drivers are not permitted to negotiate with consumers on fares charged.

198.    However, Uber can and does directly modify charges to consumers if Uber determines that a driver has taken a circuitous route to a destination.

---

[6]    *See* http://insurance.ky.gov/Documents/caridesharing071117.pdf.

*Doe 1, et al. v. Uber Technologies, Inc. Case No.:*

199.    Uber takes a fee ranging between twenty percent (20%) and thirty percent (30%) of every ride charged to a consumer.

200.    Uber controls its drivers' contacts with its consumer base, and considers its consumer list to be proprietary information.  To that end, drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber app.

201.    Uber requires its drivers to accept all ride requests when the drivers are logged into the app.  Drivers who reject too many ride requests risk facing discipline, including suspension or termination.

202.    Consumers give feedback on rides they have taken, and rate drivers on a scale from 1-5 stars.  These ratings are used by Uber to discipline and terminate drivers.

203.    Despite the above facts, as a matter of policy, Uber claims that drivers are not at-will employees, but rather independent contractors.  The value of classifying workers as independent contractors is an integral part of the ridehailing company's business model, and has saved Uber millions of dollars.

## XVI.    Uber's Perpetration of Fraud and Misleading Advertising

204.    This lawsuit seeks to compensate Jane Doe 1 and Jane Doe 2, individually, for the rapes that they suffered due to Uber's inadequate and disingenuous "commitment to safety." Importantly, Plaintiffs also seek injunctive and declaratory relief on behalf of a Class of passengers that have suffered harm because of Uber's safety failures and misleading and false representations about the safety guaranteed to passengers when taking rides ordered on the app.

205.    Uber, in line with its slogan of "Expanding Globally," aggressively and intentionally disregarded years of policy and regulation controlling taxi and transportation infrastructures around the country.

206. Had Uber not sacrificed passenger safety for the sake of profit and expansion, and actually cared about who it was employing to drive its vehicles, rather than being preoccupied with racing to control its share of the taxi market, at the expense of existing taxi companies and consumers, Plaintiffs herein and proposed Class members would not have been harmed.

207. Uber has, and continues to, knowingly mislead the public about the safety and security measures it employs to ensure even basic levels of consumer safety.

208. Passengers, including Plaintiffs, reasonably relied on Uber's representations and promises about its safety and security measures, including its driver screening, background check procedures, ongoing monitoring of driver conduct while driving for Uber, and insurance coverage in place for rides on the app. Uber's passengers, including Plaintiffs, utilized Uber's taxi services as a result of this reliance.

209. Had Uber knowingly provided truthful and accurate data about its procedures as compared to the stringent methods used by licensed taxi and for-hire car companies throughout the U.S., including its comparatively deficient driver screening, background check procedures, monitoring of driver conduct while driving for Uber and insurance coverage in place for rides on the app, reasonable consumers, passengers, Plaintiffs and the Class members would not have downloaded the app or purchased rides on the app for transport.

210. Uber engaged in these misleading and false advertisements and representations at all times during the Class period, including by making such representations on multiple media platforms, including its website, paid internet ads, magazines, newspapers, billboards and the sides of buses.

211.   Uber engaged in its intentional misrepresentations for the express purpose of protecting its brand, its reputation and to increase profits by increasing the number of rides and rides requested as a result of consumers reliance on the false information.

212.   For instance, after visiting Uber's website before signing up for the Uber app, Plaintiffs were aware of Uber's multiple promises to consumers that consumer safety was a priority. Among those statements, *inter alia*, were the following:

- "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road.  That means setting the strictest safety standards possible, then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - what we're doing in the US is an example of our standards around the world."

- "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."

- "Making cities better is at the heart of everything we do. It's much more than improving the way people get around. It's celebrating what makes those cities special, caring about the people who make them great, and being responsible citizens. That's why we work hard to keep our streets safe for everyone, whether they're on foot, on a bike, or in another car."

213.   In deciding to download the Uber app, Class members, including Plaintiffs, relied on advertisements that recommended taking Uber over driving while intoxicated.

214.   Class members, including Plaintiffs, relied on these representations and rode in vehicles driven by Uber drivers as a result.  Uber knew that its representations and promises about passenger safety were false and misleading, yet continued to allow its passengers to

believe in the truth of its representations and promises, and to profit from its passengers' reliance on such representations and promises.

215.    Unsurprisingly, in the U.S., despite its proclamations that consumer safety is its top priority, Uber has actively pushed back against legislation and other measures requiring strong background checks for its drivers out of the public's view.

216.    For instance, according to media accounts, in Colorado, Uber persuaded lawmakers to ease drivers' background checks in a bill legalizing ridehailing companies, including abolishing FBI background checks and fingerprint checks.

217.    Similarly, media reports indicate that in Illinois, Uber lobbied Governor Pat Quinn to veto a bill that would have forced Uber to strengthen background checks.

218.    In California, Uber is alleged to have helped defeat a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers.

219.    In addition, Uber has been repeatedly sued for its deceptive practices regarding background checks.  For instance, as referenced above, the district attorneys of San Francisco and Los Angeles filed suit against Uber alleging that the Company had misled consumers about its background checks by misrepresenting the extent to which Uber screens its potential drivers.

**XVII.    Plaintiffs Seek Immediate Injunctive Relief Ordering Uber to Affirmatively Overhaul Its Woefully Inadequate Safety Measures, So That No Woman Has to Ever Endure What They Experienced**

220.    The foregoing negligent and fraudulent behavior on the part of Uber demonstrates that the Company must take immediate action to improve the safety of its consumers, which has sadly played a narrow role thus far in Uber's quest to "expand" globally and reap profits.

221.    As detailed below, Plaintiffs are not subject to the grossly unconscionable and unfair terms in the app that disproportionately favor Uber and harm passengers.

222.    Importantly, for purposes of this action, Plaintiffs and Class members are not subject to any terms listed on the app relating to arbitration. Pursuant to California Supreme Court decisions, Uber cannot cause consumers to waive a statutory right to seek public injunctive relief in any forum. Such a provision is contrary to California public policy and unenforceable under California law.

## XVIII. Terms and Conditions of the App

### A.    Consumers Are Not Required to or Asked to Read the Terms and Conditions of the App

223.    At all relevant times, all passengers who have downloaded and opened the Uber app have been prompted to enter information into a few screens.

224.    On the first screen, passengers are prompted to enter an email, a mobile phone number, and a password. There is "helper text" at the bottom of the screen that provides an explanation for why the information sought in the form is needed, stating: "We use your email and mobile number to send you ride confirmations and receipts."

225.    On the second screen, passengers are then also prompted to enter a full name and a photo. The helper text on this screen states: "Your name and photo helps your driver identify you at pickup."

226.    On the final screen, passengers are prompted to enter a credit card number. The helper text on this screen states: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy."

227.    Importantly, there is no indication to the prospective passenger that the text of "Terms & Conditions and Privacy Policy" is a link that can be clicked and that will lead to the full text of the Terms and Conditions.

228.    There is no information about the "Terms & Conditions and Privacy Policy" on the prospective passenger's screen and no prompt is provided to suggest that she should open any link.

229.    Indeed, the text "Terms & Conditions and Privacy Policy" is in a lighter, lower contrast font as compared to the other helper text, further obscuring its significance.

230.    The helper text on each of the three screens is in an identical location – toward the bottom of the screen.

231.    On each screen, the prospective passenger merely needs to enter information into the fields, and then to select the "Next" button at the top of the screen.

232.    To advance past the final screen, where the credit card number is entered, again, there is no requirement to review the Terms & Conditions and Privacy Policy.

233.    Instead, the button at the top of the screen merely says "Done" and only indicates advancing through the process for each screen.

**B.      Passengers Did Not Agree to the Terms and Conditions**

234.    At no point did Jane Doe 1 or Jane Doe 2 assent or agree to the Terms and Conditions to the app.

235.    There is no statement that clicking "Done" signifies assent to the purported contract implied in the Terms and Conditions.

236.    Once the prospective consumer advances through the third screen, where she has entered her credit card number, she has created an account with Uber and the application is complete.

237.    There is no indication that by selecting the "Done" button on the final screen, the prospective consumer is also assenting to the Terms and Conditions, or even any clear indication that selecting "Next" is the final step to account creation.

238.    At no point prior to their harm, were Jane Doe 1 or Jane Doe 2 required to open a link to the Terms and Conditions.

239.    At no point were Jane Doe 1 or Jane Doe 2 required to view the Terms and Conditions.

240.    At no point were Jane Doe 1 or Jane Doe 2 required to check a box that says "I Agree" to the Terms and Conditions.

241.    At no point were Jane Doe 1 or Jane Doe 2 required to indicate that they have assented to the Terms and Conditions.

242.    At no point were Jane Doe 1 or Jane Doe 2 required to affirm that they had even read the Terms and Conditions.

243.    The full text of the Terms and Conditions are never provided to the prospective consumer during the process of signing up for an account.

244.    The Terms and Conditions are never emailed to the prospective consumer, at account creation or otherwise.

245.    The Terms and Conditions are never mailed to the prospective consumer, at account creation or otherwise.

246.    During the account creation process, the prospective consumer can only click through an optional link to view the Terms and Conditions through the screen on which the credit card number is entered.

247.    Once the account is created, to access the Terms and Conditions within the app, a consumer is required to click first on a menu button, sift through multiple pages and links in order to find a "Legal" link under the menu sidebar.

248.    Once in the "Legal" section, a consumer can access some version of Uber's Terms and Conditions.

249.    After clicking on "Terms & Conditions" in the app, the default set of terms and conditions that comes up is for Australia.

250.    The font in which the Terms and Conditions are printed is microscopic.

251.    The default Terms and Conditions consist of 4,604 words and 68 paragraphs of legalese.

252.    To access Terms and Conditions that would purportedly bind individuals in countries other than Australia, one must identify and then use a drop-down menu to find the relevant country.

253.    There is no direct link to Uber's Terms and Conditions on the homepage of the Company's website.

254.    In order to find the Terms and Conditions, one must first click on a sidebar labeled "Menu." The Terms and Conditions are not available through links such as "About Us," "Safety" or "Help Center."

255.    Indeed, typing in "Terms and Conditions" into the search field in "Help Center" only yields the result of "Gift Cards Terms and Conditions."

256. In order to find the Terms and Conditions, a prospective user must sift through multiple pages and links in order to find the "Legal" link under the "Menu" sidebar.

257. The Terms and Conditions to which a prospective consumer in the United States would be bound has an arbitration provision that, upon a recent revision of the Terms and Conditions, is now highlighted in the first section, but has previously been buried as far down as numbered item 6 – "Dispute Resolution."

258. When viewing the Terms and Conditions in the app, a user must scroll through approximately seven (7) full pages of microscopic text to reach the "Dispute Resolution" provision.

**C.    Because Passengers Never Assented to the Terms and Conditions, They are Not Binding**

259. Based on the foregoing, neither Jane Doe 1 nor Jane Doe 2 were provided conspicuous notice of the existence of alleged contract terms when she downloaded the app.

260. At all relevant times, neither Jane Doe 1 nor Jane Doe 2 were required to, and nor did they, review the Terms and Conditions of the app.

261. Similarly, neither Jane Doe 1 nor Jane Doe 2 were required to, and nor did they, click the link and review the provisions located within the "Terms & Conditions and Privacy Policy."

262. Neither Jane Doe 1 nor Jane Doe 2 were required to check a box that affirmed that they "agreed" to the Terms and Conditions when they downloaded the app.

263. Uber failed to properly notify its consumers, including Jane Doe 1 and Jane Doe 2, when modifications were made to the Terms and Conditions. Through their continued use of the app, Jane Doe 1 and Jane Doe 2 were not required to, and nor did they, affirmatively agree to the Terms and Conditions of the app.

Page **47** of **58**

264.    At all relevant times, Uber never mailed or emailed Jane Doe 1 or Jane Doe 2 a copy of the Terms and Conditions.

**D.    Uber Retained the Right to Unilaterally Change the Terms and Conditions of the App**

265.    At all relevant times, including when Plaintiffs downloaded the app, the Terms and Conditions contained language purporting to grant Uber the unilateral right to modify the agreement.

266.    Pursuant to the Terms and Conditions, Uber provided itself with the exclusive ability to alter allegedly binding agreement terms and simultaneously removed any obligation to send notice to consumers regarding modifications.

267.    Instead, Uber simply included a provision in the Terms and Conditions that contractual changes are effective once posted on its website, http://www.uber.com/legal.

268.    In the Terms and Conditions, Uber requires arbitration for any claims that arise out of the use of the app.  It excludes from arbitration claims any brought "to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights."

269.    Upon information and belief, Uber's arbitration provision excludes the types of claims Uber is most likely to bring against others, while requiring arbitration for the types of claims most likely to be brought against Uber.

270.    Recovery is also severely limited by Uber's Terms and Conditions.

271.    According to the Terms and Conditions, Uber's liability for any and all damages and losses incurred cannot exceed $500.

## CLASS ACTION ALLEGATIONS

272.     Plaintiffs seek redress in their individual capacities and on behalf of a Class consisting of similarly situated consumers.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) or (b)(3), Plaintiffs seek Class certification of a Class defined as follows:

> All individuals in the U.S. who obtained rides using the Uber app and were subject to rape, sexual assault or gender-motivated violence or harassment by their Uber driver in the last four years.

273.     Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or subclass divisions after discovery.

274.     Excluded from the Class are: (i) any judge presiding over this action and their family members; (ii) Uber, its subsidiaries, successors or any entity in which Uber or its parent that has a controlling interest, Uber's current or former employees, officers, directors; (iii) persons that properly exclude themselves form the Class; and (iv) the legal representatives, successors or assigns of any properly excluded persons.

275.     **Numerosity**.  The potential Class members as defined are so numerous and diversely located throughout the U.S. that joinder of all Class members is impracticable.  Class members are located throughout the U.S.  Joinder is therefore not practicable.  While the exact number of Class members is unknown because such information is in the exclusive control of Uber, upon information and belief, the Class is greater than 100 individuals.

276.     **Commonality**.  There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individuals Class members.  These common questions of law and fact include, *inter alia*, whether:

- Uber violated the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.;

- Uber engaged in, and continues to engage in, unlawful, fraudulent and unfair practices that are substantially likely to mislead the public, and therefore members of the Class;

- Uber has engaged in and continues to engage in unlawful, fraudulent and unfair practices, including by representing to the public, and Class members, that it provides safe rides and adequately screens drivers when Uber knows that it fails to screen drivers in any meaningful way, thereby presenting grave threats to Class members' safety and well-being;

- Uber fraudulently and unfairly misrepresents to Class members that Uber had the ability to and would in fact accurately track the transport of Class members from where they were picked up to their destinations;

- Uber fraudulently and unfairly misrepresents to Class members that drivers are adequately insured or that Uber maintains proper and adequate insurance coverage for rides;

- Uber fraudulently and unfairly misrepresents to Class members that Uber would monitor the criminal backgrounds for drivers after they started driving for Uber in any meaningful way, thereby presenting grave threats to Class members' safety and well-being;

- Uber's deceptive conduct resulted in profits and pecuniary gain received from consumers, including Class members;

- Whether Class members are entitled to restitution under Cal. Bus. & Prof. Code. §§17200-17203;

- Whether Class members are entitled to declaratory and injunctive relief under Cal. Bus. & Prof. Code. §17204;

- Whether Plaintiffs and Class members are entitled to injunctive relief, attorneys fees' and costs under Cal. Civ. Code § 1780; and

- The nature of the relief, including equitable relief, to which Class members are entitled.

277.   Thus, commonality of factual and legal issues is satisfied.

278.   **Typicality**.  Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and Class members were exposed and subjected to Uber's uniform practices and policies surrounding its driver screening and monitoring procedures, as well as Uber's representations to the public and the Class about the safety of Uber's rides, including the safety of Uber's drivers that has resulted in, and will continue to cause, irreparable harm but for immediate action by the Court.

279.   **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent and protect the interests of the Class members.  Plaintiffs' counsel are competent and experienced in litigating class actions.

280.   **Superiority of Class Action**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all of the Class members is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

281.   **Injunctive and Declaratory Relief**.  Uber's practices are uniform as to all Class members.  Uber has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

### FIRST CAUSE OF ACTION
**(Unfair Fraudulent and Unfair Business Practices Act,**
**California Business and Professional Code §§ 17200, *et seq*.)**
***On Behalf of Plaintiffs and Proposed Class Members***

282.   Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

283.   Uber has engaged in and continues to engage in unlawful, fraudulent and unfair practices that are substantially likely to mislead the public, and therefore members of the Class.

284.    Uber made intentional misrepresentations of fact to Jane Doe 1 and Jane Doe 2, known by Uber to be false and substantially misleading, including that Uber would safely transport Plaintiffs through Uber's driver agents, Abdullah and Miguel LNU.  Uber made such false representations after failing to screen the drivers in any meaningful way, thereby presenting grave threats to Plaintiffs' safety and well-being.

285.    Uber has engaged in and continues to engage in similar unlawful, fraudulent and unfair practices, including by representing to the public and Class members that it provides safe rides and adequately screens drivers when Uber knows that it fails to screen drivers in any meaningful way, thereby presenting grave threats to Class members' safety and well-being.

286.    Uber further fraudulently and unfairly misrepresented to Plaintiffs that Uber would provide a safer ride home for Plaintiffs than had they driven home while intoxicated, and that it had the ability to and would in fact accurately track the transport of Plaintiffs from where they were picked up to their destinations.  Uber has made and continues to make such false and unfair representations to the public, including Class members.

287.    Plaintiffs believe that Uber's fraudulent and deceptive conduct resulted in profits and pecuniary gain received from consumers, including Class members.

288.    The business acts and practices of Uber are unlawful, unfair and deceptive within the meaning of the consumer protection statutes because, inter alia, Uber engaged in fraud by intentionally misrepresenting that it provides safe rides and adequately screens drivers when Uber knows that it fails to screen drivers in any meaningful way, thereby presenting grave threats to Class members' safety and well-being, and otherwise engaged in acts that deceived, or were likely to deceive the public.

289.     As a direct and proximate result of Uber's conduct, as set forth herein, Uber has received ill-gotten gains and/or profits, including, but not limited to money.  Therefore, Uber is and was unjustly enriched.

290.     Pursuant to Business & Professions Code § 17203, Plaintiffs and the Class request restitution and/or restitutionary disgorgement of all sums, including profits, obtained in violation of Business & Professions Code §§ 17200, et seq.

291.     Plaintiffs and the Class seek injunctive relief, restitution and restitutionary disgorgement of ill-gotten gains from Uber as provided in Business & Professions Code § 17203. Plaintiffs engaged counsel to prosecute this action.

292.     Plaintiffs and the Class seek to enjoin Uber from engaging in these wrongful practices, as alleged herein, in the future.  There is no other adequate remedy at law and if an injunction is not ordered, Plaintiffs and the Class will suffer irreparable harm.

### SECOND CAUSE OF ACTION
**(Violation of the Consumer Legal Remedies Act ("CLRA"),
Cal. Civ. Code § 1750, *et seq.*)
*On Behalf of Plaintiffs and Proposed Class Members***

293.     Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

294.     Plaintiffs and each Class member is a consumer and Uber's transportation services are goods or services as those terms are defined in Cal. Civ. Code § 1761.

295.     Uber is a "person," as that term is defined in Cal. Civ. Code § 1761(c).

296.     Plaintiffs' and each Class member's transportation or ride through the use of the Uber app constituted a "transaction," as that term is defined in Cal. Civ. Code § 1761(e).

297.     As detailed above, Uber has engaged in and continues to engage in business practices in violation of Cal. Civ. Code § 1750, *et seq.* (the CLRA) by *inter alia*, actively

concealing and failing to warn passengers about the inadequacy of its background screening or drivers, as well as its failure to monitor conduct of Uber drivers after hire.

298. Uber also misleads consumers about the safety of its transport by falsely suggesting that it has the ability to, and in fact does, monitor passengers' transport during rides.

299. Uber also misleads passengers about the level of insurance that the Company has that is applicable to cover passengers, the insurance Uber requires drivers to have, the insurance coverage actually carried by drivers, as well as the circumstances in which Uber regularly disclaims coverage.

300. Uber has actively concealed and failed to disclose this information knowing that such information is material to a reasonable consumer's decision to use the app for transport, and thereby misrepresented the safety of rides offered on the app.

301. Uber's business practices are unfair and/or deceptive and should be enjoined.

302. Uber has engaged in unfair or deceptive acts or practices intended to result in consumers using the app to arrange transport and consumers agreeing to pay Uber for the ride in violation of Cal. Civ. Code § 1770.

303. Uber knew and/or should have known that its concealment and/or omissions of material fact concerning its safety representations to consumers, including its screening of drivers, monitoring of drivers' conduct after hire, safety during transport, as well as applicable insurance coverage, the were material and likely to mislead the public. Accordingly, Uber's conduct alleged herein violates the CLRA, including Cal. Civ. Code §§ 1770(a)(7) and (a)(9).

304. As a direct and proximate result of Uber's conduct, as set forth herein, Uber has received ill-gotten gains and profits. Therefore, Uber has been unjustly enriched.

305.   There is no other adequate remedy at law, and Plaintiffs and the Class will suffer irreparable harm unless Defendant's conduct is enjoined.

306.   Pursuant to Cal. Civ. Code §§ 1780(a) and (e), Plaintiffs and the Class seek an order enjoining Defendant's unlawful business practices as alleged herein.

307.   On November 10, 2017, Plaintiffs notified Uber in writing that its conduct is in violation of the CLRA and demanded that Uber remedy the violations.  If after 30 days, Uber has failed to remedy its violations and provided notice to its affected consumers, Plaintiffs will amend this Complaint to add claims for actual, punitive and statutory damages pursuant to the CLRA, § 1782(2), including attorneys' fees and costs to the full extent allowed by law.

308.   Additionally, under Cal. Civ. Code § 1021.5, Plaintiffs and the Class seek reasonable attorneys' fees as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorneys' fees.

### THIRD CAUSE OF ACTION
### (Assault & Battery)
### *On Behalf of Jane Doe 1 and Jane Doe 2 Individually*

309.   Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

310.   The violent acts committed against Plaintiffs by Uber's drivers while they were performing their job duties, including their rapes and sexual assaults of Plaintiffs, amounted to a series of harmful and offensive contacts to Plaintiffs, and reasonable apprehension in Plaintiffs of immediate harmful or offensive contact to Plaintiffs, all of which were done intentionally and without Plaintiffs' consent.

311.   Uber is liable for the actions of its agents and employees directly and under the doctrine of respondent superior.

312.     Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business.  Uber breached its duty of care in its actions towards Plaintiffs.

313.     As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

314.     As a direct and proximate result of the aforementioned conduct, Plaintiffs have incurred medical expenses and other economic damages.

315.     The conduct of Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to Cal. Civ. Code § 3294.

316.     Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of California and any other applicable jurisdiction within the United States of America;

B.     An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.     Enter a permanent injunction directing that Uber take all affirmative steps necessary to remedy the effects of the unlawful conduct alleged in this Complaint, and to prevent repeated occurrences in the future, including the issuance of an order directing that Uber must immediately implement stricter and more thorough screening of potential Uber drivers as well as subject existing Uber drivers to an immediate review of conduct engaged in by all drivers during the last 12 months;  implement a policy to monitor driver conduct after they have been accepted to drive on the app; implement changes to provides a means to monitor rides during transport and centralize methods to quickly notify Uber when a driver has gone off the app during a ride or substantially driven off route during an ongoing ride; and implement adequate insurance coverage for all stages of a ride and clearly inform the public about its insurance coverage polices;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all physical, monetary and/or economic harm; for harm to their   professional and personal reputations and loss of career fulfillment; for all non-monetary

and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries; all other monetary and/or non-monetary losses suffered by Plaintiffs;

     E.     An award of punitive damages;

     F.     An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

     G.     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: November 14, 2017
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _Jeanne Christensen_
    Jeanne M. Christensen
    Elizabeth J. Chen

85 Fifth Avenue
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845
jchristensen@wigdorlaw.com
echen@wigdorlaw.com

**ANDERSON & POOLE, P.C.**

By: _____
    Jamie C. Couche

601 California Street, Suite 1300
San Francisco, CA 94108
Tel.: (415) 956-6413
Fax: (415) 956-6416
jcouche@adplaw.com

*Counsel for Plaintiffs*